UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| AMY LYNN CARLIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:19-cv-551-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Amy Lynn Carlin ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Act, and her application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* docket entry dated October 1, 2020).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 14, 19. Plaintiff also filed a reply brief. *See* ECF No. 20. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 14) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 19) is **GRANTED**.

## BACKGROUND

Plaintiff protectively filed her applications for DIB and SSI on February 25, 2016, alleging disability beginning August 14, 2015 (the disability onset date), due to: neuropathy, a pituitary gland cyst, hypothyroidism, thyroid nodules, depression, panic attacks, vitamin deficiency, acid

reflux, diverticulosis, left side occipital neuralgia, a benign neoplasm on the pituitary gland, and eye issues. Transcript ("Tr.") 14, 133-45, 179. The claims were denied initially on June 15, 2016 (Tr. 14, 95-96), after which Plaintiff requested an administrative hearing (Tr. 14, 95-96). Administrative Law Judge John Loughlin (the "ALJ") conducted a video hearing on May 15, 2018, from Alexandria, Virginia. Tr. 14. Plaintiff appeared and testified in West Seneca, New York, and was represented by Jeanne Murray, an attorney. Tr. 14, 32-64. Jane E. Beougher, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id.*

The ALJ issued an unfavorable decision on July 23, 2018, finding that Plaintiff was not disabled. Tr. 14-25. On February 28, 2019, the Appeals Council denied Plaintiff's request for further review. Tr. 1-3. The ALJ's July 23, 2018 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.    The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the

Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his July 23, 2018 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020;

2. The claimant has not engaged in substantial gainful activity since August 14, 2015, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.);

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; bilateral shoulder impingement; bilateral lateral epicondylitis; bilateral eye cataract and pre-glaucoma; left-sided occipital neuralgia; and adjustment disorder with depression. (20 CFR 404.1520(c) and 416.920(c));

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926);

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[1] except the claimant can frequently push or pull and reach overhead with both upper extremities. The claimant can frequently balance, kneel, crouch, stoop, and crawl, can frequently climb stairs and ramps, can never climb ladders, ropes, and scaffolds, can never be exposed to unprotected heights and moving machinery parts, and cannot perform assembly line work. The claimant is able to understand and remember simple instructions, make simple work-related decisions, carry out simple instructions, can occasionally deal with changes in a routine work setting, and can occasionally deal with supervisors, co- workers, and the public;

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965);

7.  The claimant was born on January 14,1972 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963);

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964);

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a);

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 14, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 14-25.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits protectively filed on February 25, 2016, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 25. The ALJ also determined that based on the application for supplemental security benefits protectively filed on February 25, 2016, the claimant is not disabled under section 1614(a)(3)(A) of the Act. *Id*.

## **ANALYSIS**

Plaintiff asserts three points of error: (1) The ALJ did not properly consider the treating medical source opinions; (2) the ALJ failed to account for episodic symptoms caused by Plaintiff's conditions in the RFC; and (3) the ALJ failed to further develop the record by obtaining missing mental health treatment records and updated physical functional assessment. *See* ECF No. 14-1 at 16-27. Plaintiff argues that these errors resulted in an RFC unsupported by substantial evidence. *See id*.

The Commissioner argues in response that the ALJ properly analyzed the medical opinion evidence and the other evidence of record to determine Plaintiff's RFC and gave appropriate weight to the opined limitations that were supported by the record. *See* ECF No. 19-1 at 20-26. Further, argues the Commissioner, no further development of the record was necessary, and the ALJ did not rely on his own lay opinion to assess the limitations in Plaintiff's RFC. *See id.* at 23-26. Accordingly, argues the Commissioner, the ALJ's RFC determination is supported by substantial evidence. *See id.*

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that the ALJ set forth a well-supported RFC finding. The ALJ appropriately weighed the medical evidence, including the treatment notes, objective findings, and the medical opinions, and the ALJ's RFC determination was supported by substantial evidence.

The record reflects that Plaintiff received treatment for face pain, ear pain. facial numbness, and otalgia at DENT Neurological Institute ("DENT") from January 2014 (prior to her August 14, 2015 disability onset date) to April 2018. Tr. 288-331, 392-475, 524-551, 588-595, 773-775, 782-815. Plaintiff had an initial evaluation with Maurice Hourihane, M.D. ("Dr. Hourihane") on January 14, 2014. Tr. 314-17. She reported left ear pain, facial numbness, and joint pain. Tr. 314. Plaintiff was "moderately anxious" during the exam, and Dr. Hourihane noted that the history

provided by Plaintiff "has internally [sic] inconsistencies" and was "difficult [ ] to follow." Tr. 316.  He diagnosed atypical face pain and prescribed Lamictal. *Id*.

Thereafter, Plaintiff was followed primarily by Rebecca Buttaccio, RPA-C ("Ms. Buttaccio"), who administered a series of occipital nerve block(s) under Dr. Hourihane's supervision. Tr. 297-299, 300-302, 303-308, 309-312.  In May 2014, Plaintiff reported her pain increased with stress or lack of sleep, and she had panic attacks on a daily basis. Tr. 309. Ms. Buttaccio said she would refer Plaintiff to psychiatrist Alfred Belen, M.D. ("Dr. Belen"), "[f]or her mood," and Plaintiff was "agreeable." Tr. 311.

On October 28, 2015, Plaintiff initiated primary care treatment at Universal Primary Care with Julie Elsigan, RPA-C ("Ms. Elsigan"). Tr. 258-61. Plaintiff reported falling after her leg gave out. Tr. 258, 501. Ms. Elsigan noted trace lower leg edema and mild lower abdominal tenderness, but the examination was otherwise essentially normal. Tr. 260, 502. Ms. Elsigan assessed hypothyroidism, depression, cranial neuralgia, vitamin D deficiency, gastro-esophageal reflux disease ("GERD") with esophagitis, unspecified edema, and history of thyroid nodule. Tr. 260.

On November 18, 2015, Plaintiff was seen by Joseph Woodley, O.D., ("Dr. Woodley"), of Allegheny Ophthalmology, P.L.L.C, for pain behind her left eye. Tr. 227-29. Examination results were essentially normal and further testing was planned. Tr. 228.

Plaintiff had a follow-up appointment with Ms. Buttaccio at DENT on November 27, 2015. Tr. 297-99. Ms. Buttaccio had last seen Plaintiff in June 2015; Plaintiff reported that the previous injection had provided 50 percent reduction in her headaches. Tr. 297. Plaintiff informed Ms. Buttaccio that she had an MRI after her last visit due to increased headaches and double vision. *Id*. Ms. Buttaccio noted that the MRI showed an abnormality in the pituitary gland that was new since the last scan in January 2014. *Id*. Plaintiff reported frequent headaches, mostly in the left occipital

region with radiation to the left temporal and retro-orbital regions, and she also complained of increased nagging neck and left arm pain, which was not helped by increasing her medication. *Id*. She denied weakness; her double vision was unchanged; and she had not gone to physical therapy. *Id*. She was pleasant and in no acute distress with appropriate affect and eye contact. Tr. 298. Her occipital nerves were tender to palpation and she had slightly limited cervical range of motion. *Id*. She had normal muscle bulk and strength; intact extremity sensation; and no extremity spasticity or clonus. *Id*. Ms. Buttaccio administered an occipital nerve block which provided immediate relief of Plaintiff's headache. *Id*.

On December 7, 2015, Plaintiff saw Ms. Elsigan at Universal Primary Care, complaining of left side body pain. Tr. 262, 496. Plaintiff stated her last nerve block had only lasted a few days, but it usually lasted four weeks. Tr. 262, 496. Plaintiff was comfortable and pleasant with good eye contact, good judgment and insight, full range of mood and affect, clear speech, and logical and goal-directed thought process. Tr. 264, 498. A December 16, 2015 MRI of the pituitary gland showed a fairly small cyst or cyst-like lesion unchanged from the May 2015 MRI. Tr. 236, 327, 411. Results of a cervical spine MRI were normal. Tr. 237, 325, 412.

On December 22, 2015, Plaintiff was evaluated by Dr. Hourihane at DENT. Tr. 294-95, 414. She was awake, alert, and attentive, and she reported blurred vision in both eyes, worse on the right. Tr. 296. Fundoscopy was normal, but her visual acuity was decreased. Tr. 296.

On January 1, 2016, Plaintiff was seen in the Emergency Department ("ED") at Olean General Hospital ("Olean General") after she was assaulted and hit her head on the ground. Tr. 248, 597. Her cervical spine was normal with normal range of motion and no tenderness and a neurological examination was normal. Tr. 248. Plaintiff had a small laceration that did not require sutures, and she was discharged home. Tr. 249.

8

Ms. Buttaccio saw Plaintiff for an occipital nerve block on January 20, 2016. Tr. 292-94. Plaintiff was pleasant and in no acute distress with appropriate affect and eye contact. Tr. 293. Her occipital nerves were tender to palpation. *Id.*

A February 9, 2016 thyroid ultrasound showed no nodule, but there was heterogeneity (character diversity) of the thyroid echogenicity (the ability of tissue to reflect an ultrasound wave) with moderate generalized vascularity of the thyroid gland. Tr. 274, 417.

On February 11, 2016, Plaintiff was evaluated by Kevin Cuddahee, FNP, NP-BC ("Mr. Cuddahee"), at University at Buffalo Neurosurgery ("UBNS"). Tr. 280-81. Her visual acuity was 20/40 bilaterally; she had full visual fields; and her pupils were equal, round, and reactive to light. Tr. 281. Plaintiff had intact shoulder shrug and full muscle strength. *Id.* Mr. Cuddahee reviewed Plaintiff's May 2015 brain MRI, as well as her December 2015 scan, noting a cyst-like lesion, which appeared to be stable. *Id.* Mr. Cuddahee stated: he did not believe the cyst contributed to Plaintiff's symptoms; there was no evidence of any optic nerve or optic chiasm compression; and surgical intervention was not necessary at this time. *Id.*

On February 25, 2016, Plaintiff was seen by Ann N. Anderson, PA ("Ms. Anderson"), at Universal Primary Care. Tr. 267-68. Plaintiff complained of "falling issues," reporting she had fallen twice that morning. Tr. 267. Plaintiff also stated she was unable to work due to visual disturbances and pain, primarily left-sided facial pain with radiation down her left arm. Tr. 267, 513. Upon examination, Plaintiff was pleasant and comfortable with no head, eye, or neck/thyroid abnormalities. Tr. 267. She had steady gait and position changes, normal speech and behavior, and hyper reflexes, more so on the right. Tr. 268.

Ms. Anderson and Rohan O'Leary, M.D. ("Dr. O'Leary"), completed a checklist medical source statement dated February 25, 2016. Tr. 399-401. They opined that Plaintiff would miss four

9

days of work monthly, and she had multiple environment limitations. Tr. 399. In addition, she had occasional restrictions with sitting, frequent restrictions with standing and walking; and continuous restrictions with stooping and climbing. *Id*. Plaintiff could frequently lift/carry up to five pounds, occasionally perform fine manipulation and raise her left arm over shoulder height, frequently raise her right arm over shoulder level, and occasionally to frequently perform gross manipulation. *Id*. Her pain level was characterized as extreme and severe. Tr. 400. Plaintiff needed to elevate her legs 2 to 3 times daily, she needed to lie down 3 to 6 times daily, and she would be off task 80 percent of the workday. *Id*. She was occasionally precluded from understanding and remembering very short and simple instructions; occasionally to frequently precluded from understanding and remembering detailed instructions; and frequently precluded from performing activities within a schedule, maintaining regular attendance, sustaining an ordinary routine, working in coordination with or proximity to others, adapting to ordinary stress or changes in the workplace, and maintaining attention and concentration for extended periods of time. *Id*. Further, Plaintiff had limitations interacting appropriately with the general public, accepting instructions, and responding appropriately to criticism from supervisors. *Id*. Her limitations with asking simple questions, requesting assistance, getting along with co-workers or peers, maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness was rated as both "yes" and "no." *Id*. Pain adversely affected Plaintiff's sleep, it was reasonable that her condition or medication would cause lapses in memory and/or concentration, and she would need unscheduled breaks beyond the normal breaks and lunch break. Tr. 400-01.

On February 27, 2016, Plaintiff sought treatment at Olean General ED after a fall. Tr. 250. Plaintiff reported she fell, and a bookshelf landed on her. Tr. 433. Left hand, forearm, and shoulder x-rays were normal. Tr. 437-39. A head CT scan was also normal. Tr. 440. Examination was

normal, except for left arm and leg contusions, erythema, and pain. Tr. 250-51. Plaintiff was discharged and instructed to get a repeat wrist x-ray in two weeks to rule out fracture. Tr. 252. On March 3, 2016, Plaintiff sought care again at Olean General ED for shoulder pain. Tr. 254, 601. Examination was normal except for left arm and shoulder contusions, decreased range of motion, discoloration, pain, swelling, and tenderness. Tr. 254-55, 602.

On March 7, 2016, Ms. Elsigan at Universal Primary Care noted that Plaintiff had less dizziness after a recent gabapentin dosage adjustment, but her head pain continued. Tr. 269, 509. Plaintiff was right-hand dominant and had left arm and leg bruising, a black eye, and a swollen wrist and hand, but she was improving. Tr. 269, 509. Plaintiff's depression was also improving after a medication change. *Id*. She was well nourished, comfortable, and pleasant with diffuse left arm discoloration, a swollen and warm elbow, but she had almost full hand and wrist range of motion and mild metacarpal tenderness. Tr. 272, 511. Plaintiff had good eye contact, good judgment and insight, full range of mood/affect, clear speech, and logical and goal-directed thought processes. Tr. 272, 511-12.

Plaintiff saw Ms. Buttaccio at DENT for an occipital nerve block on March 9, 2016. Tr. 290. Plaintiff was pleasant and in no acute distress with appropriate eye contact and affect. Tr. 291. Plaintiff's occipital nerves were tender to palpation bilaterally. *Id*. That same day Ms. Buttaccio and Dr. Belen completed a check-box medical source statement (Tr. 403-05) agreeing with the assessment in an identical medical source statement completed by primary care providers, Ms. Anderson and Dr. O'Leary on February 25, 2016 (Tr. 399-401).

Plaintiff was seen by Norah Lincoff, M.D. ("Dr. Lincoff"), at the UBMD Neuro-Ophthalmology Clinic, on March 30, 2016, for complaints of left eye pain. Tr. 458-63. She had

20/20 corrected visual acuity in both eyes and no signs of retinopathy or optic neuropathy. Tr. 461. Dr. Lincoff reassured Plaintiff that her examination showed no disease. Tr. 462.

On April 26, 2016, consultative examiner Sara Long, Ph.D. ("Dr. Long"), conducted a psychological exam of Plaintiff on behalf of the state. Tr. 343-46. Plaintiff said she was laid off from her job because no work was available. Tr. 343. Plaintiff was neat, well groomed, and cooperative with good social skills, appropriate eye contact, and normal motor behavior. Tr. 344. She had clear and fluent speech, coherent and goal-directed thought processes, and euthymic mood, and she displayed a full range of appropriate affect in speech and thought; some depression was indicated. *Id*. Plaintiff had clear sensorium, intact orientation, intact attention and concentration, poor to fair insight and judgment, and intact memory. Tr. 344-45. She reported cooking, cleaning, doing laundry, and shopping when her son was home. Tr. 345. Dr. Long opined that Plaintiff may have mild limitations understanding and following simple directions and performing simple tasks due to her reports of discomfort and depression-related distraction; however, throughout the evaluation Plaintiff maintained attention and concentration. *Id*. Dr. Long opined that Plaintiff could maintain a regular schedule, learn new tasks, adequately relate with others, and adequately manage stress. *Id*.

On May 12, 2016, Plaintiff had a new patient visit with by Charles Niles, M.D. ("Dr. Niles"), of Ophthalmoloqy Associates of Western NY. Tr. 351-53.[2] Plaintiff had been referred for a glaucoma evaluation. Tr. 351. Plaintiff reported her vision was always blurry, and glasses didn't help. *Id*. Dr. Niles diagnosed pre-glaucoma of both eyes. Tr. 353.

A week later, on May 19, 2016, Plaintiff saw Neha Bansal, M.D., for "evaluation of pituitary." Tr. 360-61. Plaintiff had no significant abnormalities on examination. Tr. 361. Dr.

---

[2] The Court notes that records pertaining to another patient are erroneously included in the records provided by Dr. Niles. Tr. 355-57

Bansal noted Plaintiff's pituitary cyst but deemed it inconsequential and not impacting Plaintiff's pituitary function. *Id*. Dr. Bansal also reviewed thyroid imaging, noting that the results were consistent with Hashimoto's hypothyroidism; she determined that no additional follow up was needed. *Id*.

On May 24, 2016, Plaintiff saw Mohaned Al-Humadi, M.D. ("Dr. Al-Humadi"), at Foothills Medical Group, for left shoulder and elbow complaints. Tr. 373, 552, 657, 837. Examination revealed no left shoulder swelling or discoloration, and Plaintiff had good range of motion. Tr. 373, 552, 657. Plaintiff had positive impingement and pain with supraspinatus and infraspinatus, but her strength was normal. *Id*. Plaintiff had elbow discoloration, tenderness over the lateral epicondyle, and pain with resisted wrist dorsiflexion. *Id*. She was "NVID" (neurovascularly intact distally). *Id*. X-rays showed no fracture or dislocation. Tr. 373. Dr. Al-Humadi administered injections to Plaintiff's shoulder and humerus and recommended a tennis elbow strap. Tr. 374, 552-53, 657.

On May 25, 2016, consultative examiner Michael Rosenberg, M.D. ("Dr. Rosenberg"), conducted an internal medicine exam on behalf of the state. Tr. 386-390. Plaintiff reported she cooked, cleaned, did laundry, shopped, showered, dressed, watched television, read, and went to her son's sporting events. Tr. 387. She was in no acute distress; she had a slow deliberate gait; and she could not walk on her heels; however, she could walk on her toes and she did not lose her balance while walking. *Id*. Plaintiff performed a full squat; she had normal stance; she had no obvious balance disturbance; and she did not use an assistive device. *Id*. Plaintiff needed no help maneuvering on and off the exam table, and she rose from a chair without difficulty. *Id*. She had full cervical range of motion, and full range of motion in her bilateral elbows and wrists. Tr. 388. Shoulder forward elevation was performed to 110 degrees on the right and 90 degrees on the left,

bilateral shoulder abduction was performed to 90 degrees, and the remainder of bilateral shoulder range of motion was full. *Id*. Left hip flexion was performed to 90 degrees with pain, left knee flexion was to 100 degrees, and her joints were stable. *Id*. Plaintiff had no sensory deficits; her muscle strength was normal; she had no muscle atrophy; her hand and finger dexterity was intact; and her grip strength was normal. *Id*. Dr. Rosenberg opined that Plaintiff had mild restrictions lifting heavy objects, performing overhead activity, or activities requiring pulling, reaching, and repetitive arm use due to mild bilateral shoulder pain; and she should avoid heights due to a history of dizziness. Tr. 389.

During follow up with Dr. Al-Humadi on July 5, 2016, Plaintiff reported that the prior shoulder injection had helped significantly. Tr. 554, 655, 839. During examination, Plaintiff was alert, oriented, and in no acute distress. Tr. 554, 655. She had no left shoulder swelling or discoloration, but she had tenderness over the anterior and posterior joint line and positive impingement sign. *Id*. Plaintiff had discomfort with rotator cuff testing but no significant weakness; she had mild left elbow swelling, but no discoloration. *Id*. She also had tenderness over the lateral epicondyle and lateral pain with resisted wrist dorsiflexion, and she was NVID. *Id*. Left shoulder and elbow injections were administered without difficulty. *Id*.

Four days later, on July 9, 2016, Plaintiff presented to Olean General ED, complaining of a right eye injury. Tr. 613. Plaintiff reported her son punched her in the face and struck her right eye. *Id*. Plaintiff had a CT of the head and maxillofacial bones and the cervical spine, which showed a right-side nasal fracture. Tr. 615. No other injuries were noted. *Id*. She had a very small laceration below the right lid margin, which was closed with Dermabond. *Id*. Plaintiff was discharged in "stable and comfortable" condition. *Id*.

14

In a letter dated September 6, 2016, Ms. Elsigan at Universal Primary Care stated that Plaintiff was undergoing evaluation and treatment for head pain, body weakness and numbness, dizziness, anxiety, and depression. Tr. 528. Ms. Elsigan opined that Plaintiff was unable to work for at least three months; she was unable to do lifting or prolonged standing; and she was "100% disabled." *Id*.

During her September 8, 2016 appointment with Dr. Al-Humadi, Plaintiff complained of shoulder pain with reaching. Tr. 556, 653, 841. She sat comfortably, but she had pain with impingement sign and with resisted extension of the fourth digit and wrist. Tr. 556, 653. She had normal rotator cuff strength, but her sensory exam was inconsistent. *Id*. Dr. Al-Humadi administered left shoulder and elbow injections. *Id*.

Dr. Bansal saw Plaintiff on September 23, 2016. Tr. 490-91. Plaintiff had lower extremity edema, but she had no palpable neck nodules, and her examination was otherwise unremarkable. Tr. 491. Dr. Bansal ordered laboratory testing and Plaintiff was to return in three months. *Id*.

In a letter dated October 14, 2016, Dr. Belen stated that Plaintiff was advised to be off work until her February 10, 2017 appointment. Tr. 546. However. treatment notes from that same day indicate she had improved level of function and quality of life. Tr. 547.

Plaintiff saw Dr. Al-Humadi on November 28, 2016 and reported she did very well with the shoulder and elbow injections. Tr. 558, 651, 843. She was in no acute distress and she had normal strength, but there was lateral epicondyle tenderness, pain with resisted extension of the fourth digit, and positive shoulder impingement sign. Tr. 558, 651. Left shoulder and elbow injections were administered. Tr. 558-59, 651.

On January 7, 2017, Plaintiff sought care at Olean General ED for lower back and pelvic pain. Tr. 619. She was calm and cooperative and had decreased range of motion. Tr. 620-21. The ED physician diagnosed lumbar disc herniation and prescribed medication. Tr. 622.

Plaintiff had a follow-up visit with Dr. Al-Humadi on January 12, 2017. Tr. 560, 649, 845. She reported that her neurologist at DENT advised she had no left upper extremity neurological issues. Tr. 560, 649. Plaintiff stated that the previous injections helped mildly, but she still had issues with overhead activity and some pain. *Id*. Upon examination, Dr. Al-Humadi noted Plaintiff's left shoulder had positive impingement sign, but she had full active and passive range of motion with limitations due to pain. Tr. 560, 649. Dr. Al-Humadi planned to continue current management with conservative treatment, and he recommended that Plaintiff start physical therapy. Tr. 560, 649.

Five days later, on January 17, 2017, Plaintiff saw Kimberly Bielata, FNP ("Ms. Bielata"), at Universal Primary Care. Plaintiff reported the medication prescribed for back pain during her recent ED visit was ineffective and stated the ED doctor said she needed a "specialist" for her back. Tr. 585. Ms. Bielata noted that Plaintiff was alert, oriented, and cooperative with intact cognitive function and clear speech. Tr. 586. Her back was not tender to palpation, but she had left buttock tenderness; she had positive straight leg raising and good pedal pulses. Tr. 586.

In a letter dated February 10, 2017, Dr. Belen stated that Plaintiff was to be off work until her next appointment on June 30, 2017. Tr. 573.

During follow up with Dr. Al-Humadi on February 28, 2017, Plaintiff reported some relief with prior shoulder injections. Tr. 647, 846. Examination continued to show positive impingement sign and sensory deficit Dr. Al-Humadi administered a left shoulder injection. Tr. 647.

16

On March 6, 2017, Dr. Hourihane noted moderate anxiousness, diminished eye contact, and a "generalized near myoclonic jerk." Tr. 794. Dr, Hourihane stated it was "difficult to say if this [was] volitional or not." *Id*. Finger-to-nose testing varied, but it was noted as "clearly normal" at times; reflexes were intact; and "toes [were] downgoing." *Id*. Vibration and temperature sensation was symmetrical and normal, and pinprick was anesthetic. *Id*. Dr. Hourihane noted that follow-up study of Plaintiff's pituitary cyst showed no change, and therefore, further studies were not needed. Tr. 795. He recommended videonystagmography ("VNG") testing to assess Plaintiff's dizziness. *Id*. He stated that he expected the VNG to show some abnormality, but if the abnormality was "fairly minimal, [he] would recommend vestibular PT only." *Id*.

On April 6, 2017, Plaintiff fell down some stairs and sought care at Olean General ED. Tr. 624-27. She denied lightheadedness, blurry vision, and dizziness. Tr. 625. She had no neck injury, no pain at rest or with movement, and no abdominal distention, guarding, or tenderness. Tr. 626. She had left shoulder and elbow bruising, but there was no range of motion loss. *Id*. Plaintiff had no neurological deficits; x-rays of the shoulder and elbow and a lumbar spine CT scan were all negative. Tr. 627. Plaintiff stated she would like to just rest and use heat, ice, and ibuprofen; she was discharged home in stable condition. Tr. 627.

On April 17, 2017, Plaintiff saw Jessica Amborski, PA-C ("Ms. Amborski"), at DENT, for follow up of occipital neuralgia and dizziness. Tr. 789-90. Plaintiff was alert, oriented, pleasant, well groomed, and in no acute distress with appropriate affect and eye contact. Tr. 791. She had good attention, concentration, and speech and normal gait, strength, and finger-to-nose coordination. *Id*. Ms. Amborski reviewed the results of Plaintiff's March 20, 2018 VNG, noting that caloric and positional testing was normal with no peripheral involvement, but oculomotor tests, random saccades, and visual pursuit were outside of normal limits. Tr. 792. Ms. Amborski

provided a referral for vestibular therapy and instructed Plaintiff to make an appointment at the Headache Center. Tr. 792, 796-814.

On May 1, 2017, Plaintiff was admitted to Olean General for suicidal ideation. Tr. 629-30. She stated she was at her "breaking point" with her son's Asperger's and Tourette's conditions. Tr. 629. Apparently, Plaintiff wrote a note to her son expressing suicidal ideation, which her son showed to his father. *Id*. The father called police, and Plaintiff was taken to the hospital. *Id*. Once at the hospital, however, Plaintiff consistently denied suicidal ideation and expressed significant remorse for her statements. *Id*. She was calm, cooperative, and appropriate, and she ate and slept well. *Id*. Plaintiff was discharged home with medication and instructed to follow up with the outpatient appointments that had been arranged for her. Tr. 630.

Thereafter, Plaintiff received outpatient therapy through ARA-The Counseling Center from May 7, 2017 to April 12, 2018. Tr. 660-772. She was oriented and cooperative with depressed mood that stabilized with therapy; and she had appropriate affect, intact thought processes, logical and goal-directed thought content, and good insight and judgment. Tr. 699-700, 703-04, 743-46, 749, 751-52, 754, 757, 759, 762, 764-65, 767, 769.

Plaintiff saw Jacqueline Czwojdak, PA-C ("Ms. Czwoidak"), at Universal Primary Care, on May 8, 2017.  Tr. 582-84. Plaintiff told Ms. Czwoidak she was applying for Social Security disability and requested a note permanently excusing her from work. Tr. 582. She was alert, oriented, and cooperative with intact cognitive functioning and clear speech. Tr. 583. Ms. Czwoidak assessed a "moderate episode of recurrent major depressive disorder" and advised Plaintiff to discuss work notes with her primary care physician or her neurologist. Tr. 584.

The next month, on June 20, 2017, Plaintiff again presented to Olean General ED, complaining of left arm pain and weakness after falling three weeks prior. Tr. 632-37. She had

reduced and painful left arm range of motion and shoulder and elbow joint tenderness to palpation, but no swelling. Tr. 635. X-rays were negative (Tr. 635), and nerve conduction studies were advised (Tr. 636).

Plaintiff returned to Dr. Al-Humadi on July 13, 2017 for follow up of her shoulder and elbow pain. Tr. 645. Plaintiff had normal strength, positive impingement, decreased upper arm sensation, and left elbow tenderness on July 13, 2017. Tr. 645, 847. Dr. Al-Humadi administered injections in both areas. *Id*. He noted that Plaintiff's pain improved with the injections, and he would continue with conservative treatment. *Id*.

On August 18, 2017, Plaintiff had a follow-up visit with Rachel Pientka, RPA-C ("Ms. Pientka"), at DENT, for her head pain. Tr. 786. Plaintiff was alert, oriented, pleasant, well groomed, and in no acute distress with appropriate affect and eye contact. Tr. 788. Plaintiff had good attention, concentration, speech, and fund of knowledge. *Id*. She had normal strength, normal heel and toe walking, and normal gait with good arm swing and no ataxia. *Id*. Plaintiff had slightly limited neck range of motion and tenderness in the trapezius and occipital nerve. *Id*. Ms. Pientka advised Plaintiff that "[they] did not put people out of work for headaches," and they would not be "approving social security benefits for headaches." Tr. 789. She also told Plaintiff that there was no need to further follow her abnormal brain MRI "due to the stability." *Id*.

On September 12, 2017, Plaintiff saw Seth Achey, PA-C ("Mr. Achey"), at Foothills Medical Group, for left shoulder and elbow pain. Tr. 643, 827. Mr. Achey noted that Plaintiff had not been seen in several months, but injections had helper her pain in the past. Tr. 643. Plaintiff had no left elbow swelling or discoloration, but there was pain with resisted wrist dorsiflexion and tenderness to epicondyle palpation. *Id*. Plaintiff had good shoulder range of motion, but overhead motion was painful, and she had positive impingement. *Id*. She had weakness, but no significant

pain with rotator cuff testing. *Id*. Mr. Achey administered injections to Plaintiff's left shoulder and elbow and noted that Plaintiff tolerated the procedure well. *Id*.

During a neurological reevaluation with Ms. Pientka at DENT on November 8, 2017, Plaintiff alleged worsened facial pain. Tr. 783. She stated she hit her head during a recent fall. *Id*. She was alert, oriented, pleasant, well groomed, and in no acute distress with appropriate affect and eye contact. Tr. 785. Plaintiff sat comfortably and had good attention, concentration, and speech. *Id*. She had trapezius and occipital nerve tenderness and normal muscle strength and gait. *Id*. Ms. Pientka diagnosed atypical facial pain, trigeminal neuralgia, and a head injury, and ordered additional testing. *Id*. Plaintiff asked Ms. Pientka to complete social services paperwork for welfare benefits, which Ms. Pientka declined to complete. *Id*. Ms. Pientka discussed Plaintiff's request with Nicolas Saikali, M.D. ("Dr. Saikali"), and Dr. Saikali explained to Plaintiff that they could not complete the forms because "atypical facial pain and trigeminal neuralgia are not conditions for which [Plaintiff] cannot not work." *Id*.

In her first two points, Plaintiff alleges that the ALJ improperly evaluated medical opinion evidence under the provisions of the regulations at 20 C.F.R. §§ 404.1520c and 416.920c; ignored Dr. Belen's January 2018 opinion; and failed to explain why opinions regarding off-task limitations and missed work days due to her "episodic symptoms" were excluded from the RFC. *See* ECF No. 14-1 at 16-22. Plaintiff alleges that these errors resulted in an RFC assessment not supported by substantial evidence. *See id*. Plaintiff is incorrect. The ALJ properly analyzed the opinions, as well as the other evidence of record, when developing Plaintiff's RFC. Tr. 22-23. *See* 20 C.F.R. §§ 404.1527, 416.927.[3] The ALJ clearly stated that the appropriate regulations were

---

[3] On January 18, 2017, the agency published final rules titled "Revisions to Rules Regarding the Evaluation of Medical Evidence." 82 Fed. Reg. 5844. These final rules were effective as of March 27, 2017. Some of the new final rules state that they apply only to applications/claims filed before March 27, 2017, or only to applications/claims filed on or after

considered and provided an adequate analysis (Tr. 19, 22-23), and the Court finds that the ALJ granted appropriate weight to the opined limitations that were supported by the record. Furthermore, the Court finds that the RFC assessed by the ALJ was supported by substantial evidence.

A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the

---

March 27, 2017. *See, e.g.*, 20 C.F.R. §§ 404.1527, 416.927 (explaining how an adjudicator considers medical opinions for claims filed before March 27, 2017) and 20 C.F.R. §§ 404.1520c, 416.920c (explaining how an adjudicator considers medical opinions for claims filed on or after March 27, 2017); *see also* Notice of Proposed Rulemaking, 81 Fed. Reg. 62560, 62578 (Sept. 9, 2016) (summarizing proposed implementation process). Here, although the agency's final decision was issued on May 2, 2018, after the effective date of the final rules, Plaintiff filed his claim before March 27, 2017. Thus, the 2017 revisions apply to this case, except for those rules that state they apply only to applications/claims filed on or after March 27, 2017.

RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at \*3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.). Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588.

As noted above, Plaintiff takes issue with the ALJ's consideration of the opinions of Dr. Belen, Plaintiff's treating psychiatrist at DENT. The opinions of Plaintiff's treating physicians should be given "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record," 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, a treating physician's opinion is not afforded controlling weight when the opinion is inconsistent with other substantial evidence in the record, such as the opinions of other medical experts. 20 C.F.R. § 404.1527(d)(2); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). If the ALJ gives the treating physician's opinion less than controlling weight, she must provide good reasons for doing so. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).

If not afforded controlling weight, a treating physician's opinion is given weight according to a non-exhaustive list of enumerated factors, including (i) the frequency of examinations and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the

physician's opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether

the physician has a relevant specialty. 20 C.F.R. §§ 404.1527(c) (2), 416.927(c)(2); *see Clark*, 143

F.3d at 118; *Marquez v. Colvin*, No. 12 CIV. 6819 PKC, 2013 WL 5568718, at *9 (S.D.N.Y. Oct.

9, 2013). In rejecting a treating physician's opinion, an ALJ need not expressly enumerate each

factor considered if the ALJ's reasoning and adherence to the treating physician rule is clear. *See,*

*e.g., Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013). Furthermore, as long as the ALJ is

careful to explain his decision, he is entitled to reject portions of a medical opinion that conflict

with other evidence in the record. *See Raymer v. Colvin*, No. 14-CV-6009P, 2015 WL 5032669,

at *5 (W.D.N.Y. Aug. 25, 2015) ("an ALJ who chooses to adopt only portions of a medical opinion

must explain his or her decision to reject the remaining portions").

Here, the ALJ referenced Dr. Belen's February 2017 assessment that Plaintiff was advised

to be out of work until her next appointment (Tr. 23, 573), but Plaintiff argues that the ALJ erred

by not discussing Dr. Belen's January 2018 opinion (*see* ECF No. 14-1 at 17). However, the opined

limitations in Dr. Belen's January 2018 opinion were consistent with the ALJ's RFC finding that

Plaintiff could understand, remember, and carry out simple instructions; make simple work-related

decisions; and occasionally deal with supervisors, coworkers, and the public. Tr. 19. Dr. Belen

opined that Plaintiff had no limitations with maintaining socially appropriate behavior or basic

standards of personal hygiene and grooming, using public transportation, and making simple

decisions. Tr. 590. She could understand and remember simple to complex instructions, maintain

attention and concentration, and interact appropriately with others for two to four hours. *Id*. Her

conditions were expected to improve with proper treatment. *Id*.

Dr. Belen also opined that Plaintiff was not employable "in any capacity" (Tr. 589);

however, such an opinion involves an issue reserved to the Commissioner. A treating physician's

conclusion that a claimant cannot work is entitled to no deference "because a finding of disability is one reserved for the Commissioner." 20 C.F.R. § 404.1527(d) (an opinion on the ultimate issue of disability is not a medical opinion, and is not entitled to any "special significance"); *Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008); *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."). While an ALJ considers medical opinions on a plaintiff's functioning, ultimately, the ALJ is tasked with reaching an RFC assessment based on the record as a whole. *See* 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner.").

Contrary to Plaintiff's argument that the ALJ failed to explicitly consider all of the regulatory factors in assessing medical opinion evidence (*see* ECF No. 14-1 at 17-18), the ALJ's decision reflects consideration of the regulatory factors for treating physician physicians at 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5), sometimes referred to as the "Burgess Factors."[4] *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (per curiam). *Estrella* requires an ALJ to "explicitly consider" the regulatory factors when assigning other than controlling weight to the opinion of a treating physician. *Estrella*, 925 F.3d at 95-96 (citing *Burgess v. Astrue*, 537 F.3d 117, 129; 20 C.F.R. § 404.1527(c)(2)) (other citations omitted)). The ALJ sufficiently did that in this case. As noted above, an ALJ need not expressly enumerate each factor considered. *Marquez v. Colvin*, 2013 WL 5568718, at *9. Moreover, even if the ALJ failed to explicitly consider each

---

[4] The Burgess Factors are essentially the treating physician factors noted above: (i) the frequency of examinations and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the physician's opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the physician has a relevant specialty.

factor, the Commissioner's decision will be affirmed if a "searching review of the record" assures the Court "that the substance of the treating physician rule was not traversed." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (per curiam) (citing *Burgess v. Astrue*, 537 F.3d at 129 (other citations omitted); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ adequately considered the regulatory factors in this case.

Plaintiff also argues that the ALJ failed to include off task and missed work limitations. *See* ECF No. 14-1 at 22-24. However, the record fails to support such limitations, and therefore, they were properly excluded. With respect to the various opinions reflecting off task limitations and missed work, the Court notes that these were check-box opinions without support in the record. Tr. 399-405. In 2016, Ms. Anderson and Ms. Buttaccio, with joining signatures from Drs. O'Leary and Belen, opined that Plaintiff would be off task 80% of the workday. Tr. 400, 404. However, no such significant restrictions are contained in the treatment notes, and subsequent evidence demonstrates good or intact attention and concentration. Tr. 344-45, 785, 78. The more a medical source presents relevant evidence to support the opinion the more weight is properly afforded to the opinion. *See* 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3). Additionally, after a thorough consultative examination, Dr. Long opined that Plaintiff could maintain a regular schedule. Tr. 345. An ALJ may rely on the opinion of a consultative examiner. *See Camille v. Colvin*, 652 F. App'x 25, 27 n.2 (2d Cir. 2016); *Lamond v. Astrue*, 440 F. App'x 17, 21-22 (2d Cir. 2011); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (report of a consultative physician may constitute substantial evidence to contradict the opinion of a treating physician); 20 C.F.R. §§ 404.1519a(b), 416.919a(b).

Furthermore, other treating sources, including Ms. Pientka and Dr. Saikali declined to support Plaintiff's claim that she was disabled. Tr. 785, 789. As noted above, Dr. Belen's 2018

opinion also assessed that Plaintiff could maintain attention and concentration consistent with the ALJ's RFC finding (Tr. 590), and  Dr. Long also assessed limitations consistent with the ALJ's RFC finding, including the ability to maintain attention and concentration (Tr. 344-45). Similarly, there is no evidence to support the estimated four days of work missed per month. Tr. 399, 403. The record in this case reflects intact attention and concentration. Tr. 344-45, 785, 788, 791, 794. Furthermore, Plaintiff's reported activities indicate abilities inconsistent with being off task 80 percent of the day. Tr. 400. For example, as the ALJ noted, Plaintiff testified she drives several times per week, and there was no evidence that she was advised to stop driving. Tr. 20, 42, 784, 788.

With respect to physical limitations, the ALJ noted Plaintiff's testimony that she could walk for fifteen minutes and estimated that she could lift two pounds with her left hand and twelve pounds with her right hand; she can carry light groceries if she uses both hands; and she prepares light meals, washes dishes, and sweeps. Tr. 20. The ALJ also noted that although Plaintiff reported left-sided muscle weakness, exhibited slow, deliberate gait, could not walk on heels or toes, and demonstrated reduced range of motion of the lumbar spine. (Tr. 361, 387-88), she also at times exhibited normal, steady gait without difficulty and without assistive devices (Tr. 255); intact sensory and full motor strength, normal muscle bulk, full squat, normal stance, negative straight leg raise testing, and no atrophy (Tr. 255, 258, 387-88).  Tr. 20.  Furthermore, the ALJ noted that on more than one occasion, and as recently as March 2018, Plaintiff denied musculoskeletal problems. (Tr. 227, 774). Tr. 20.

After careful consideration of the record taken as a whole, the ALJ set forth a well-supported RFC finding. The ALJ was not required to wholesale adopt any medical opinion. *See O'Neil v. Colvin*, No. 13-cv-575, 2014 WL 5500662, *6 (W.D.N.Y. Oct. 30, 2014) ("the ALJ's

RFC finding need not track any one medical opinion"). It was the ALJ's duty to review the evidence taken as a whole, resolve any inconsistencies, and formulate a RFC finding that reflects Plaintiff's credible limitations. *See* 20 C.F.R. §§ 404.1529, 404.1545, 404.1546, 416.929, 416.945, and 416.946; *see also Carney v. Berryhill*, No. 16-cv-269, 2017 WL 2021529, *4 (W.D.N.Y. May 12, 2017). The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ. *See Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009); *see also Burgess*, 537 F.3d at 128. Plaintiff has failed to meet this burden,

Plaintiff next claims that there must be missing records from Dr. Belen because their treatment relationship began in 2014, but there are only two treatment assessments in the record. *See* ECF No. 14-1 at 24-25. Therefore, according to Plaintiff, the ALJ must have failed to fulfill his duty to develop the record by obtaining missing mental health treatment records from Dr. Belen. *Id*. As an initial matter, simply having a treating relationship does not indicate that records for a particular period of time exist, nor does it indicate the frequency of treatment. In this case, Plaintiff has not shown that additional records actually exist, much less what they contain.

Furthermore, an ALJ's duty to develop the record is not limitless. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x at 34. Most basically, an ALJ need not further develop the record "when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.'" *See Janes v. Berryhill*, 710 F.App'x 33, 34 (2d Cir. Jan. 30, 2018) (summary order (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996); *see also Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. Jan. 8, 2015) (summary order) (although an ALJ has a duty to develop the record, where there are no obvious gaps and the ALJ possesses a complete medical history, he is under no obligation to seek a treating-source opinion (citations omitted)).

Additionally, a challenge that the record must be supplemented by the ALJ will not prevail without an explanation of "how it would have affected [the] case." *Reices-Colon v. Astrue*, 523 F.App'x 796, 799 (2d Cir. May 2, 2013). Here, Plaintiff simply argues that the record was incomplete, but she does not argue with any specificity how these records would have affected the case. It was Plaintiff's burden to produce evidence demonstrating disability Plaintiff's mere assertion that records must be missing is insufficient. *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits.). Thus, Plaintiff's argument that the ALJ failed in his duty to develop the record is meritless. *See Morris v. Berryhill*, 721 F. App'x 25, 27-28 (2d Cir. 2018) (summary order) (explaining that the mere "theoretical possibility" of missing records that might be probative of disability "does not establish that the ALJ failed to develop a complete record"). Accordingly, Plaintiff's argument fails, and the Court finds no error.

As discussed above, the ALJ considered all the evidence during the alleged period of disability and the record contained sufficient evidence to support the ALJ's decision. Furthermore, as also discussed above, Dr. Belen's January 2018 opinion is consistent with the ALJ's RFC finding. Accordingly, no further development was required in this case. *See Brogan-Dawley v. Astrue*, 484 F. App'x 632, 634 (summary order) (2d Cir. 2012) (holding that the ALJ was not required to further develop the record when the available evidence was adequate to determine that the claimant was not disabled); *Johnson v. Colvin*, 669 F. App'x at 46 (explaining that "because the record contained sufficient other evidence supporting the ALJ's determination and because the ALJ weighed all of that evidence when making his residual functional capacity finding, there was no 'gap' in the record and the ALJ did not rely on his own 'lay opinion'").

Plaintiff also inaccurately argues that the ALJ improperly relied upon his own lay opinion to assess limitations related to shoulder and lumbar impairments because there are no corresponding medical opinions. *See* ECF No. 14-1 at 25. For the same reasons discussed above, Plaintiff's argument is meritless. The ALJ considered the record as a whole, and the record contained sufficient evidence to support the ALJ's findings with respect to Plaintiff's musculoskeletal limitations. First, the ALJ discussed Dr. Rosenberg's opinion and granted it some weight because it was largely consistent with his examination. Tr. 22. Dr. Rosenberg noted, among other things, full ranges of motion in the shoulder and lumbar spine, negative straight leg raising, normal muscle strength, no sensory deficits, normal grip strength, and intact dexterity. Tr. 388. Dr. Rosenberg opined that Plaintiff had mild restrictions lifting heavy objects, performing overhead activity, or activities required pulling, reaching, and repetitive arm use due to mild bilateral shoulder pain. Tr. 389. The ALJ also properly noted other evidence reflecting normal gait, full motor strength, normal muscle bulk, negative straight leg raise testing, intact sensation, and no assistive devices, as well as Plaintiff's recent denials of musculoskeletal problems. Tr. 20, 227, 255, 258, 361, 387-88, 774.

While Plaintiff may disagree with the ALJ's conclusion, the Court must "defer to the Commissioner's resolution of conflicting evidence" and reject the ALJ's findings "only if a reasonable factfinder would have to conclude otherwise." *Morris v. Berryhill*, No. 16-02672, 2018 WL 459678, at *3 (internal citations and quotations omitted); *Krull v. Colvin*, 669 F. App'x 31 (2d Cir. 2016) (the deferential standard of review prevents a court from reweighing evidence); *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) ("Under this very deferential standard of review, once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise."). Further, it is the ALJ's duty to evaluate

conflicts in the evidence. *See* 20 C.F.R. § 404.1527(c)(i); *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("Once the ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would have to conclude otherwise"); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 7 (2d Cir. 2017) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (quoting *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

For all the reasons discussed above, the Court finds that the ALJ properly considered the record as a whole, including medical opinion evidence, treatment reports, and diagnostic testing, as well as Plaintiff's testimony, and those findings are supported by substantial evidence. Accordingly, the Court finds no error.

## <u>CONCLUSION</u>

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 14) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 19) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE